**SO ORDERED.**

**SIGNED March 12, 2013.**



ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

| | |
|---|---|
| GULF FLEET HOLDINGS, INC., et al, | CASE NO. 10-50713 |
| Debtors | Chapter 11<br>(Jointly Administered<br>with Case Nos. 10-50714<br>thru 10-50723) |

------------------------------------------------------------------

ALAN GOODMAN, TRUSTEE FOR THE
GULF FLEET LIQUIDATING TRUST,

    Plaintiff

| | |
|---|---|
| VERSUS | ADVERSARY CASE NO. 12-05024 |

TRIPLE "C" MARINE SALVAGE, INC.,

    Defendant

------------------------------------------------------------------
**REASONS FOR DECISION**
------------------------------------------------------------------

This adversary proceeding involves preference claims by Alan Goodman, the trustee of the Gulf Fleet Liquidating Trust (the "Trustee") against Triple "C" Marine Salvage, Inc. ("Triple 'C'").

The court previously granted in part and denied in part the Trustee's motion for summary judgment on its preference claims as well as Triple "C"'s defenses. The court granted the motion with respect to the Trustee's case-in-chief and Triple "C"'s new value defenses, but denied the motion with respect to Triple "C"'s ordinary course defense. On January 17, 2013, the court conducted a one-day trial on Triple "C"'s ordinary course defense, and took the case under advisement following the trial. After considering the trial record, the parties' arguments, and the relevant authorities, the court rules as follows.

**JURISDICTION**

This case has been referred to this court by the Standing Order of Reference entered in this district which is set forth as Rule 83.4.1 of the Local Rules of the United States District Court for the Western District of Louisiana. No party in interest has requested a withdrawal of the reference. The court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Moreover, the court may enter final orders on the claims and defenses asserted in this case under Stern v. Marshall, ___U.S. ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). See First Choice Drywall, Inc. v. Presbitero (In re First Choice Drywall, Inc.), 2012 WL 4471570 (Bankr. N.D. Ill. Sept. 25, 2012)(bankruptcy court has the power to determine preference actions after Stern ); Olsen v. PG

-2-

Design/Build, Inc. (In re Smeltzer Plumbing Sys., Inc.), 2011 WL 6176213 (Bankr. N.D. Ill. Dec. 12, 2011)(same); Nanodynamics, Inc. v. Rothstein (In re Nanodynamics, Inc.), 474 B.R. 422, 429 (Bankr. W.D.N.Y. 2012) (same); Appalachian Fuels, LLC v. Energy Coal Resources, Inc. (In re Appalachian Fuels, LLC), 472 B.R. 731, 744 (E.D. Ky. 2012) (same); In re Am. Hous. Found., 469 B.R. 257, 265 (Bankr. N.D. Tex. 2012) (same); In re DBSI, Inc., 467 B.R. 767, 773 (Bankr. D. Del. 2012) (same); West v. Freedom Medical, Inc. (In re Apex Long Term Acute Care–Katy, LP.), 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011) (same); Burtch v. Huston (In re USDigital, Inc.), 461 B.R. 276, 285 (Bankr. D. Del. 2011) (same).

## BACKGROUND

Gulf Fleet owned and operated a fleet of offshore and fast supply vessels that supported oil and gas exploration and production companies and other oilfield service companies. Gulf Fleet also operated an independent vessel brokerage business. Defendant Triple "C" supplies used equipment and parts for marine vessels. In November 2009, Gulf Fleet purchased four reconditioned capstans for installation on its vessels. Two of the capstans, represented by invoice number 20091201-C, were delivered on November 25, 2009. One of these capstans was installed on the *M\V Miss Emma Jo* and the other was installed on the *M\V Gulf Pride*. The other two capstans, represented by invoice number 20091212-C,

-3-

were installed on the *M\V Gulf Quest* and the *M\V Gulf Carrier*. The invoice for the first two capstans is dated December 1, 2009 and reflects a purchase price of $13,000.00. The invoice for the other two capstans is dated December 11, 2009 and reflects a purchase price of $14,400.00. Gulf Fleet paid invoice number 20091201-C with a check issued on February 9, 2010. This check cleared on February 16, 2010. Gulf Fleet paid invoice number 20091212-C with a check dated February 23, 2010. This check cleared on February 25, 2010. Gulf Fleet filed for relief under Chapter 11 of the Bankruptcy Code on May 14, 2010. Comerica Bank filed a proof of claim in the bankruptcy case asserting a secured claim totaling $38,126,869.78 and asserting a security interest in all of the vessels owned by the debtors, including the four vessels on which the capstans purchased from Triple "C" were installed. This court subsequently approved Gulf Fleet's motion to sell certain vessels, including these four vessels, free and clear of all liens and interests. See Sale Orders dated April 29, 2011 and March 29, 2011, Case No. 10-50713, Dkt. Nos. 840 and 912. Based on the sale orders and Gulf Fleet's confirmed plan of reorganization, Comerica Bank received a distribution from the proceeds of these sales. Because these proceeds were insufficient to satisfy Comerica's claim, Comerica retained an unsecured deficiency claim. See May 2, 2002 Order, Case No. 10-50713, Dkt. No. 1233.

-4-

Gulf Fleet's confirmed plan of reorganization created the Gulf Fleet Liquidating Trust, which was charged, *inter alia*, with liquidating the remaining assets and claims of Gulf Fleet. The plan transferred certain avoidance actions to the trust. Alan Goodman was subsequently appointed trustee (the "Trustee") of the Gulf Fleet Liquidating Trust. On February 16, 2012, the Trustee commenced this adversary proceeding seeking to avoid the two payments to Triple "C" under 11 U.S.C. § 547 as avoidable preferences. On May 8, 2012, the court entered a scheduling order that set deadlines for discovery, pre-trial motions, and a trial date. On October 2, 2012, approximately forty-five days after the discovery cut-off and just over two weeks before trial, the Trustee filed a motion in limine seeking to bar Triple "C" from presenting expert testimony and undisclosed witnesses and evidence. The Trustee contended that it had served written interrogatories and requests for production of documents on Triple "C" within the discovery period. This written discovery requested that Triple "C" identify witnesses with knowledge, disclose the identity of any expert witnesses, and produce documents that Triple "C" intended to use to support its defenses at trial. The Trustee also served requests for admission. Because Triple "C" failed to timely respond to this discovery, the Trustee requested that Triple "C" be barred from presenting any expert testimony under Federal Rules of

-5-

Evidence 702, 703, or 705, and that Triple "C" be further barred from relying on any witnesses or documents that it did not identify or produce in response to written discovery requests. The court entered an order granting the Trustee's motion in part. Triple "C" was precluded from offering any expert testimony and testimony from any fact witnesses other than Jack Cloutier, Mary Cloutier, and Ryan Pecoraro. The Trustee subsequently filed a motion for summary judgment asserting that he was entitled to judgment as a matter of law on his *prima facie* case under 11 U.S.C. § 547 as well as Triple "C"'s affirmative defenses. On January 16, 2013, the court granted the Trustee's motion for summary judgement in part and denied the motion in part. Based on the court's ruling, the sole issue left for trial was Triple "C"'s ordinary course defense. The court granted partial summary judgment on the Trustee's *prima facie* case and dismissed Triple "C"'s remaining defenses. The trial was held January 17, 2013, and the court then took case under advisement.

## DISCUSSION

Triple "C" argues that the February 2010 payments fall within the "ordinary course" exception of 11 U.S.C. § 547(c)(2). Section 547(c)(2) provides that an otherwise avoidable transfer is not subject to avoidance:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--

-6-

> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms ....

11 U.S.C. § 547(c)(2). The ordinary course exception is an affirmative defense, so Triple "C" has the burden of persuasion as to each element of the defense. <u>In re Gulf City Seafoods</u>, 296 F.3d 363, 368 n.5 (5th Cir. 2002). Based on the trial record, there is no genuine dispute that the purchase of the four capstans and the corresponding debt was *incurred* in the ordinary course. Rather, the dispute centers on whether the transfers were made in the ordinary course of both parties (which is a subjective inquiry) or whether the transfers were made according to ordinary business terms as reflected in the relevant industry (which is an objective inquiry). <u>In re SGM Acquisition Co. LLC</u>, 439 F3d 233, 239 (5th Cir. 2006).

The subjective prong of the ordinary course defense requires a fact-specific examination of the parties' conduct to determine "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." <u>Lightfoot v. Amelia Maritime Services, Inc., (In re Seabridge Marine, Inc</u>.), 412 B.R. 868, 872 (Bankr. E.D. La. 2008). The factors that courts consider include (1) the time period over which the parties engaged in similar transactions, (2) whether the amount or form of payment differ from past practices, (3) the presence of any unusual

-7-

collection activity, and (4) whether the creditor took actions that gained it an advantage over other creditors in light of the debtor's deteriorating financial condition.  See Kleven v. Household Bank F.S.B., 334 F. 3d 638, 642 (7th Cir. 2003); In re Quad Systems Corp., 2003 WL 25947345 at *5 (Bankr. E.D. Pa. 2003). A creditor typically addresses these factors by establishing a "baseline of dealing" as far as the parties' past billing, payment, and collection practices.  In re Accessair, Inc., 314 B.R. 386, 393 (8th Cir. BAP 2004) (creditor had "the burden of establishing some baseline of dealings between the parties prior to the preference period").  A creditor must establish that the challenged transfer occurring during the preference period falls within the normal pattern of payment practices between the parties during the pre-preference period.  Id.  As the court ruled in connection with the Trustee's motion for summary judgment, the fact that alleged preferential transfers represent the only transactions between the parties does not bar the ordinary course defense as a matter of law.  See Kleven, 334 F. 3d at 642 (most courts "view that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2)"); see also In re Finn, 909 F. 2d 903 (6th Cir. 1990); In re Russell Cave Co., 259 B.R. 879 (Bankr. E.D. Ky. 2001).  In cases involving one-time transactions, courts look to the terms of the parties' agreement as reflected in invoices or

-8-

other documents.  See Kleven, 334 F. 3d at 642-43.  Where the payment varies from the terms of an invoice, courts may look to other evidence that the payment was consistent with the parties' agreement.  See In re Quad Systems Corp., 2003 WL 25947345 at *7 ("Despite the fact that courts generally take into account the payment terms of the underlying agreement between the parties, there is no inflexible rule that late payments cannot be ordinary").

The objective prong of section 547(c)(2) requires the creditor to show that the challenged transfers were consistent with the relevant industry standard.  In order to satisfy this burden, courts require creditors to offer evidence of payment practices between other creditors and debtors in the relevant industry.  In re Gulf City Seafoods, Inc., 296 F. 3d at 369 ("In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product.").  This standard cannot be satisfied by proof of the creditor's own dealings with the debtor or other parties, but "requires reference to some external data" involving other creditors and debtors in the relevant industry.  In re Merry-go-round Enterprises, Inc., 272 B.R. 140, 147 (Bankr. D. Md. 2000); In re Roblin Industries, Inc., 78 F. 3d 30, 43 (2d Cir. 1996)

-9-

(creditor did not sustain its burden of proof at trial because it did not produce evidence of industry practice or custom apart from the creditor's own experience).

At trial, Triple "C" relied on the testimony of Mr. Ryan Pecoraro, Mr. Jacque Cloutier, and Ms. Mary Cloutier. Triple "C" also introduced copies of invoices and e-mail correspondence exchanged with Gulf Fleet. (Defendant's Exhibits ("Def. Exh.") 1a-c, 2, 3a-c, 4, 6, and 13). Mr. Pecoraro testified that Gulf Fleet needed to purchase the capstans to install on vessels for specific contracts in November 2009. Although Gulf Fleet had not done business with Gulf Fleet in the past, Mr. Pecoraro contacted Triple "C" about whether it could supply two (eventually four) capstans for its vessels. Mr. Pecoraro testified that we was not in charge of negotiating or setting payment terms. He testified that payment terms for similar transactions in the industry varied from cash on delivery to 60 days. Industry payment practices varied depending the nature of the buyer and the length of the relationship. Where Gulf Fleet did not have a history of dealings with a vendor and the transaction was a one-time purchase, the vendor often demanded cash on delivery or short payment terms of 15 to 30 days.

Mr. Cloutier testified that payment terms varied by vendor depending on how well Triple "C" knew the buyer. In some cases, payment terms were 30 days, while others were 60 to 90 days. Mr.

-10-

Cloutier testified that the sale of four capstans to Gulf Fleet in November and December 2009 was an extraordinary sale because he could not recall Triple "C" ever selling this many capstans at one time. Mr. Cloutier testified that Mr. Pecoraro asked whether Gulf Fleet could delay payment of the invoices until the capstans were installed on the vessels. Mr. Cloutier testified that he knew Mr. Pecoraro's family and, given the large size of the transaction, was wiling to give Gulf Fleet more time to pay. Mr. Cloutier had no knowledge of when the capstans were actually installed on the vessels. Mr. Cloutier is also not responsible for invoicing or collecting accounts receivable.

Ms. Cloutier testified that she was responsible for handling invoices and accounts receivable. She testified that the written payment terms on the invoices could be modified. She testified that the final invoices for the four capstans were delayed because Gulf Fleet requested that sales tax be removed from the invoices. She further testified that, beginning in the middle of January 2010, she contacted Gulf Fleet to determine when the invoices would be paid.

Turning to the trial exhibits, the invoices sent to Gulf Fleet include specific payment terms: "net 30 days with 1 ½% per month interest charged on delinquent account, plus 25% attorney fees due on principle and interest if placed in the hands of attorney for

-11-

collection." (Def. Exh. 1a, 1b, 1c, 3a, 3b, 3c). Triple "C"'s exhibits also include e-mail correspondence between Triple "C" and Gulf Fleet beginning January 18, 2010, about the status of payment for the four capstans. (Def. Exh. 12). In this e-mail exchange, Ms. Cloutier asked Mr. Pecoraro: "Could you check and let me know when our invoices for the capstans are scheduled for payment? They are both over 30 days now." (Id.)

The ordinary course defense of section 547(c)(2) is designed to "protect **recurring**, customary credit transactions which are incurred and paid in the **ordinary course** of business of the Debtor and the transferee." In re Energy Co-Op Inc., 832 F.2d 997, 1004 (7th Cir. 1987) (emphasis added). Here, the purchase of the four capstans was a one-time transaction between these parties and, as conceded by Mr. Cloutier, was an unusually large sale for Triple "C". The only written payment term in the record is the "net 30 days" term in the invoices sent to Gulf Fleet, and Gulf Fleet's payments occurred well after 30 days. Mr. Cloutier testified that Gulf Fleet orally requested that payment of the invoices be delayed until after the capstans had been installed. However, because the record does not show when the capstans were installed in relation to the timing of the payments, the court cannot determine whether the timing of the payments was consistent with this agreement. Moreover, the existence of an informal, oral agreement on payment

-12-

is undercut by the January 2010 correspondence between Triple "C" and Gulf Fleet that appears to refer to the 30-day payment term in the invoices sent to Gulf Fleet. With respect to the objective, industry standard prong of the defense, the record shows a wide range of industry payment terms from cash on delivery to 60 days with no uniform industry-wide standard. However, Mr. Pecoraro testified that vendors typically require cash on delivery or short, 15 to 30 day payment terms for one-time transactions. The payments in the present case are not consistent with that standard. Considering the record as a whole, the court concludes that Triple "C" has not met its burden of proof under either the subjective or objective prong of the ordinary course defense.

### CONCLUSION

For the foregoing reasons, the court **GRANTS** judgment in favor of the Trustee on his section 547(b) preference claim in the amount of $27,400.00. The Trustee shall prepare and submit a judgment that reflects the court's ruling herein.

###

-13-